LEWIS, J.
Petitioners, each of which is a pari-mu-tuel wagering permit holder licensed by respondent, the Division of Pari-Mutuel Wagering, Department of Business and Professional Regulation (“Division”), petition for review of an emergency rule adopted by the Division, which repeals Florida Administrative Code Rule 61D-11.027.[1] Petitioners argue that the Divi *561 sion’s findings of an immediate danger to the public health, safety, or welfare, upon which emergency rule 61DER05-1 is based, are insufficient to justify emergency rulemaking pursuant to section 120.54(4), Florida Statutes (2005). Because we agree, we grant the petition and quash the emergency rule as invalid.
In its reasons for finding an immediate danger to the public health, safety, or welfare, the Division explained that such a danger existed due to the conduct of statutorily unauthorized “no-limit” poker tournaments, which required immediate repeal of rule 61D-11.027, and that the provisions of that rule that remain following our af-firmance of an order of an administrative law judge in Department of Business and Professional Regulation, Division of Pari-Mutuel Wagering v. Calder Race Course, Inc., 913 So.2d 601 (Fla. 1st DCA *562 2005) (unpublished table opinion),[2] conflicted with the bet and raise limitations enumerated in section 849.086(8) (b), Florida Statutes. According to the Division, the remaining provisions of the rule may, therefore, mislead those regulated by the rule to believe that no-limit poker tournament play is authorized. Attached to the Division’s reasons was a flier advertising new structured/no-limit Texas Hold’em tournaments at a licensed pari-mutuel facility that is not a party to this action.
We have jurisdiction to review an emergency rule promulgated by an administrative agency, see § 120.54(4)(a)3.; Fla. Health Care Ass’n v. Agency for Health Care Admin., 734 So.2d 1052, 1053 (Fla. 1st DCA 1998), and such jurisdiction is properly exercised where, as here, petitioners maintain that the emergency rule deprives them of a right that they would have otherwise been entitled to. See Little v. Coler, 557 So.2d 157, 158 (Fla. 1st DCA 1990). Due to the accelerated emergency rulemaking process, judicial review takes place without an intervening administrative challenge to exhaust administrative remedies. Fla. Democratic Party v. Hood, 884 So.2d 1148, 1151 (Fla. 1st DCA 2004). In actions such as this, the courts do not generally concern themselves with the substantive validity of the emergency rule; rather, the concern is whether the agency followed the requirements of section 120.54(4)(a), Florida Statutes. Id.
Section 120.54(4)(a), Florida Statutes (2005), provides that, where an administrative agency finds that an immediate danger to the public health, safety, or welfare requires emergency action, it may adopt any rule necessitated by such danger. The agency may adopt a rule by any procedure that is fair under the circumstances as long as the procedure provides a minimum amount of procedural protection, the agency takes only that action necessary to protect the public interest, and the agency publishes, in writing, the specific facts and reasons for finding an immediate danger to the public health, safety, or welfare and its reasons for concluding that the procedure used is fair under the circumstances. § 120.54(4)(a), Fla. Stat. (2005). In order to utilize emergency rulemaking procedures rather than employing standard rulemaking, an agency must express factually explicit and persuasive reasons at the time of promulgation of the rule for finding a genuine emergency. Fla. Health Care Ass’n, 734 So.2d at 1053 (citing Fla. Home Builders Ass’n v. Div. of Labor, Bureau of Apprenticeship, Fla. Dep’t of Commerce, 355 So.2d 1245, 1246 (Fla. 1st DCA 1978)).
Although the Division attached one advertisement for no-limit poker tournaments being held at one licensed cardroom to its reasons for finding an immediate danger, it did not demonstrate that any other cardrooms were conducting such tournaments to support its assertion that the existence of rule 61D-11.027 may mislead licensees to believe that no-limit tournaments were authorized. Moreover, the Division did not show that any particular members of the public were actually faced with an immediate danger to their health, safety, or welfare as a result of the no-limit tournaments that were apparently *563 held at this one cardroom. See Fla. Health Care Ass’n, 734 So.2d at 1054 (determining that the reasons for finding an immediate danger given by the agency were inadequate where the agency failed to provide a factual basis to support its conclusion that consumers might be misled by the nursing home rating system and did not establish that, if anyone had been misled in such manner, it resulted in an actual risk to the health, safety, or welfare of the affected persons). As petitioners argue, neither the order that was affirmed in Colder Race Course, Inc., the provisions of rule 61D-11.027 that remained in effect following that decision, nor the conduct of no-limit poker tournaments created an immediate danger to the public health, safety, or welfare. Therefore, the Division’s reasons for finding an immediate danger do not rise to the level of an emergency contemplated by section 120.54(4)(a), Florida Statutes (2005), and are inadequate to justify emergency rulemaking. Cf. Fla. Democratic Party, 884 So.2d at 1150-51 (finding the Department of State’s reasons for finding an immediate danger sufficient where, due to the invalidation of a prior rule prohibiting manual recount of votes cast on touchscreen voting systems, no statewide standards for conducting manual recounts of votes cast on such systems existed, and the absence of such standards would adversely affect elections in Florida because if a manual recount was required, counties with touchscreen systems would have to conduct them without applicable standards unless the emergency rule was adopted).
Accordingly, we GRANT the petition and QUASH emergency rule 61DER05-1 as invalid.
KAHN, C.J., and POLSTON, J., concur.

. In its entirety, Florida Administrative Code Rule 61D-11.027, which is entitled "Tournaments,” provides:
(1) A series of games of poker may include tournament play. Tournaments may only be conducted at licensed pari-mutuel facilities and must comply with the following criteria:
(a) Cardroom operators must use for tournament play a game authorized for general cardroom play under Rule 61D-11.002, F.A.C. Any authorized game used for *561 tournament play must be listed on the cardroom operator's approved license application, or on any subsequent applications/amendments that may be submitted for approval;
(b) No less than 9 players must be registered as participants at the start of play;
(c) Either a minimum of 15 hands per table per tournament, or a minimum of one hour’s duration per tournament, must be played. After the minimum requirements have been satisfied, wagering shall conform to the established rules and guidelines of the cardroom operator;
(d) Tournaments must commence and conclude on the same calendar day; and
(e) Only one entry per player per tournament.
(2)(a) The tournament entry fee per participant shall be based upon a maximum of $2 per bet and three raises per betting round. The entry fee shall not exceed the maximum potential value wagered by a single player in an individual game that is being used for tournament play.
(b) The cardroom operator is prohibited from allowing a participant to pay any fee to re-enter the same tournament. A participant's elimination from a tournament is final.
(c) There shall be a designated winner for each individual hand of tournament play. The play of progressive games is prohibited.
(3) Tournaments shall be played only with tournament chips that are visually distinct from those used in normal cardroom operations, and shall be provided to the participants in exchange for an entry fee.
(a) All players shall receive an equal number of tournament chips for their entry fee.
(b) Tournament chips shall have no cash value and shall represent tournament points only.
(c)Tournament chips shall not be redeemed for cash or for any other thing of value except that the point total represented by the players' accumulations of tournament chips shall be used to determine the tournament winners and/or final place in the tournament.
(4) Prizes may not exceed the aggregate entry fees paid by the participants.
(5) No table rake shall be made during tournament play.
(6) Gross receipts for a tournament shall mean the total amount received by the cardroom operator from all entry fees.
(7) Cash received for tournament entry fees must be kept separate and apart from all other cash received by the cardroom operator or management company until such time as it is counted. The cardroom operator shall report tournament activity on BPR Form 16-008. This form shall be filed with the division by the fifth day of each calendar month for the preceding calendar month's activity. BPR Form 16-008 is adopted and incorporated by Rule 61D-12.001, F.A.C.
(8)(a) The cardroom operator shall provide the tournament rules to the division, and shall furnish copies upon request to interested participants.
(b) The published tournament rules shall include, but are not limited to, information regarding the amount of the prizes using a stated percentage of gross receipts, whether the tournament's duration of play is based upon a fixed number of games or a stated time period, the use of blinds, and the wagering rules as authorized in paragraph (l)(c) above.

. In Calder Race Course, Inc., we affirmed an order in which an administrative law judge found, among other things, (1) that Florida Administrative Code Rule 61D-11.027(l)(a) violated section 120.52(8)(c), Florida Statutes, by enlarging the specific provision of law implemented, (2) that rule 61D-11.027(2)(a) exceeded the Division's grant of rulemaking authority, modified the specific law implemented, and was arbitrary, thus violating sections 120.52(8)(b), (c), and (e), Florida Statutes, and (3) that rules 61D-11.027(l)(e) and (2)(b) violated sections 120.52(8)(b)-(c), Florida Statutes.